### STROECKER v. PATTERSON et al.

#### (Circuit Court of Appeals, Ninth Circuit.   February 1, 1915.)

#### No. 2411.

1. MINES AND MINERALS ⬤⟿55—CONVEYANCE OF MINING CLAIM—RIGHT TO ROYALTIES.

Where the owner of an undivided interest in a mining claim, who had leased the entire claim from his co-owner under a lease providing that he should possess and work the entire claim, including his interest, under the terms of the lease, sublet the claim to another, reserving a percentage of the gross output, and thereafter conveyed his undivided interest to his wife, the wife did not thereby become entitled to all of the royalties reserved in the sublease, as against the trustee in bankruptcy of her husband's estate.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 153–165;  Dec. Dig. ⬤⟿55.]

2. BANKRUPTCY ⬤⟿303—ACTIONS BY TRUSTEE—EVIDENCE.

In a suit by a trustee in bankruptcy to set aside a conveyance by a husband to his wife as a fraud upon creditors, evidence *held* sufficient to cast upon the defendants the burden of showing the good faith of the conveyance, so that it was error to dismiss the suit at the close of the complainants' evidence.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462;  Dec. Dig. ⬤⟿303.]

Appeal from the District Court of the United States for the First Division of the Territory of Alaska; F. E. Fuller, Judge.

Suit by Edward Stroecker, as trustee of the estate of H. J. Patterson, a bankrupt, against Mariam A. Patterson and H. J. Patterson. Decree for the defendants, and complainant appeals. Reversed and remanded for new trial.

McGowan & Clark  and Harry E. Pratt, all of Fairbanks, Alaska, for appellant.

A. R. Heilig, of Fairbanks, Alaska, for appellee Mariam A. Patterson.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge.   This suit was brought by the trustee of the estate of a bankrupt to set aside a conveyance made by him to his wife of an undivided one-fourth interest in a certain placer mining claim called Pat Daly Bench, situate on Ester creek, Alaska, on the ground of alleged fraud in the making of such conveyance, and also to restrain the defendants, husband and wife, from demanding and receiving from

the lessee of the entire claim 5 per cent. of the gross output of the gold thereof—the complaint alleging, among other things, in substance, that on the 27th day of November, 1911, the defendant H. J. Patterson, being then insolvent and unable to pay his then creditors, for the purpose of hindering, delaying, and defrauding them, executed to his wife, the defendant Mariam A. Patterson, a deed conveying all of his interest, to wit, an undivided one-fourth, of the mining claim mentioned, which his said wife took and since holds in trust for her husband, to aid him in cheating his creditors; that prior to that alleged fraudulent conveyance the husband held a lease of the whole of the said mining claim, which lease he, prior to his adjudication in bankruptcy, assigned for a valuable consideration to one H. C. Hamilton, who is still the owner and holder thereof, and under which he is mining the said claim upon the terms and conditions of the original lease thereof to H. J. Patterson, and of the sublease of the latter to him; that under such terms and conditions the defendant H. J. Patterson was entitled to receive from Hamilton's operations of the property 5 per cent. of the gross output of the ground; that the interest of the said H. J. Patterson under the lease has never been assigned to any one; that his wife, the said Mariam A. Patterson, claims to be the assignee of all benefits under the lease, and to be entitled to receive the said 5 per cent. of the gross mineral output of the claim, by virtue of the alleged fraudulent conveyance made to her by her husband of his undivided one-fourth interest in the claim; that on or about May 8, 1912, Hamilton made his first clean-up of the dump extracted by him from the claim during the spring of 1912, and that at the time of such clean-up the defendants Patterson demanded of him the payment of 5 per cent. of the gross output thereof, which demand was refused by the said Hamilton, who still has the said 5 per cent. of the output in his possession, and that the said Hamilton will, from time to time as the said winter dump is cleaned up, have other sums of money realized therefrom, 5 per cent. of which the defendants Patterson will claim and receive from the said Hamilton, unless restrained therefrom by the court; that the said Mariam A. Patterson is insolvent, and that if she secures possession of the said 5 per cent. of the gross output of the claim the same will be lost to the creditors of her husband and to the trustee, plaintiff in the suit; that the said Mariam A. Patterson has no right to or interest in any of the said gold, and that the plaintiff, as such trustee, is entitled to receive the said 5 per cent. of the gross output of the claim, to be applied towards the payment of the creditors of the said bankrupt. The prayer of the complaint is for the appointment of a receiver to take and receive the said 5 per cent. of the gross output of the claim until the title thereto can be determined, or that the same be ordered paid into the registry of the court; for a temporary order restraining the defendants Patterson, their agents, etc., from demanding or receiving any portion of the said 5 per cent. of the said gross mineral output; and for a decree adjudging the deed from the husband to his wife fraudulent and void, and that the defendant Mariam A. Patterson convey the said undivided one-fourth interest in the said claim to the plaintiff, as trustee of the creditors of the defendant bankrupt.

The husband and wife answered separately. The answer of the wife, among other things, denied that the deed from the husband to her was made for any fraudulent purpose, and in effect set up that on the 19th day of September, 1910, James Wickersham was the sole owner of the said mining claim, and on that day entered into an agreement with the said H. J. Patterson, whereby he agreed to convey to the said Patterson an undivided one-fourth interest in the claim, if Patterson would sink a hole upon the claim to bed rock, and do the assessment work thereon for the year 1910, to which conditions the latter consented, "but desired to use what money he had for other purposes, and therefore, with the knowledge and consent of the said Wickersham, agreed with this defendant (the wife) that, if she would pay with her own funds the expense of sinking such hole to bed rock and of doing said assessment work, she should be entitled to receive and would receive a conveyance of said quarter interest, instead of said H. J. Patterson"; that in pursuance of the agreement last mentioned the defendant Mariam A. Patterson did, at her own expense, cause to be sunk, on the 20th and 21st days of September, 1910, a hole to bed rock, and did cause to be done upon the said claim the assessment work for the year 1910, for all of which work she paid to the persons doing the same the sum of $225, all of which was her separate property, in which her husband had no interest; that before Wickersham had time to execute a deed conveying a quarter interest in the claim, as he had agreed to do, he left Alaska, and did not return until late in the fall of 1911, at which time her husband requested him to convey the said quarter interest to her, "upon the ground that she had performed the conditions of said contract, but the said Wickersham preferred to, and did, make such deed to the said H. J. Patterson, without the knowledge or consent of this defendant (the wife), and delivered the same to said H. J. Patterson on or about the 10th day of November, 1911, but with the express understanding, had between the said Wickersham and the said H. J. Patterson, that the latter would convey the bare legal title to said quarter interest so received by him to this defendant (the wife); that thereafter, when this defendant learned that said deed had been made and delivered to said H. J. Patterson, she demanded from him a conveyance of the legal title to her in pursuance of his said agreement with her, whereupon said H. J. Patterson did, on the evening of November 27, 1911, by deed convey to this defendant the legal title to said quarter interest then held by him," which interest she has ever since owned, and now owns, and in which her husband never had any interest, except the bare legal title. The answer of the husband was substantially to the same effect. Both answers denied that the conveyance in question was made for any fraudulent purpose.

The record shows that on the coming on of the cause for trial the plaintiff introduced in evidence the contract between Wickersham and H. J. Patterson, the lease made by the former to the latter of the entire claim, the sublease of the claim by Patterson to Hamilton, the conveyance from H. J. Patterson to his wife, Mariam A. Patterson, and the oral testimony of H. J. Patterson and of two other witnesses, John Junkin and E. R. Peoples. Upon the conclusion of that evidence the

court below granted the defendants' motion to dismiss the suit, and in its judgment dismissing it appears the following respecting the 5 per cent. of the gross amount of gold taken from the claim by the lessee, Hamilton:

"And it further appearing from the records of this action that, on the 17th day of May, 1912, an order was made in this cause, directing H. C. Hamilton, as lessee of the Daly Bench, described in the complaint herein, [to] deposit with the clerk of this court 5 per cent. of the gross amount of gold mined by him upon said mining claim during the pendency of this action, as royalty accruing to the owner of the undivided one-fourth interest in said Daly Bench, the title to which is in controversy in this action, to be held to await the determination thereof, and that the value of the said 5 per cent. of the gross amount of gold so mined by the said Hamilton is $5,174.66. It is further ordered that, in the event that, within ten days from the date of this judgment the plaintiff has not filed with the clerk of this court a supersedeas bond, approved by the court, for an appeal from this judgment, the clerk of this court pay to the said Mariam A. Patterson, or her attorney, A. R. Heilig, the said sum of $5,174.66, if said gold dust or money has been deposited with him, and that, if the said Hamilton has deposited said gold dust with the American Bank of Alaska, then said bank pay said sum to the said Mariam A. Patterson, or her said attorney."

[1] The contract of September 19, 1910, between Wickersham and H. J. Patterson, after reciting the ownership and possession by Wickersham of the claim, and the desire of Patterson to prospect it and to take a lease thereof for its future working, provides, among other things, that:

"In consideration of the sinking of a hole from the surface to bed rock thereon, for the purpose of prospecting the said ground and determining its value, by the party of the second part [Patterson] at his own expense, the party of the first part [Wickersham] does hereby agree to make, sign, and deliver to the party of the second part a quitclaim deed to an undivided one-fourth interest in the said premises. The party of the second part undertakes hereby, in consideration of said agreement and transfer, to sink said hole upon the said premises, and to do the assessment work for the year 1910 without any expense whatever to the party of the first part. In further consideration of the rents, royalties, covenants, and agreements hereinafter reserved, and by the said party of the second part to be kept, paid, and performed, the party of the first part does hereby grant, demise, let, and lease unto the said party of the second part the whole of the said premises together with all the appurtenances. * * * And in consideration of the said demise the said party of the second part does covenant and agree to and with the said party of the first part as follows, to wit: To enter upon said demised premises within a reasonable time after the signing and sealing of these presents, and to dig, excavate, bore, or otherwise sink one hole from the surface to bed rock upon said claim, for the purpose of prospecting the said ground and doing the assessment work for the year 1910."

Under and pursuant to that lease Patterson, according to the evidence, caused two holes to be sunk on the claim, the first to bed rock at a depth of 100 feet, and the second to a depth of 125 feet. He then left the Daly Bench claim and went elsewhere to work. Thereafter, and in the year 1911, the holders of a mining claim called Happy Home Association claim, which adjoined the Daly Bench claim, took possession of the latter, claiming it to be a part of their claim; and such was the condition of affairs on the return of Wickersham to Alaska; the dispute being compromised in and by a written agreement executed November 8, 1911, by the holders of the Happy Home location on the

one part, and by Wickersham and H. J. Patterson on the other, which compromise awarded to the Happy Home claimants a strip only of the Daly Bench claim.

Shortly before the execution of that compromise agreement, to wit, October 12, 1911, Wickersham had executed to H. J. Patterson a second lease of the Daly Bench claim for a term extending to October 12, 1915, reciting, among other things, the ownership by Wickersham of the undivided three-fourths thereof and the ownership by H. J. Patterson of the remaining one-fourth, and reciting that Patterson had applied to Wickersham for a lease covering the entire claim upon certain terms and conditions, which Wickersham thereby granted; the instrument further reciting, among other things, that:

"As part consideration of this lease the party of the second part [H. J. Patterson] agrees that his undivided one-fourth interest in said premises shall be covered and included in the terms of this lease, and shall also at all times be subject to any debts, defaults, or damages resulting from the working under this lease, or for violation thereof, and the said Daly claim shall at all times be worked and considered as a whole between the parties hereto, and all subject to the terms of this lease; and it is especially agreed that the party of the first part [Wickersham] shall have a first lien upon the whole of the output of the whole of the Daly claim, including the undivided one-fourth interest of the party of the second part, for the payment of the royalty reserved to the party of the first part and the performance of the terms of this lease."

The last-mentioned instrument further imposed upon the lessee the obligation to begin work upon the leased property within 30 days from its execution, and thereafter to continuously maintain possession of the property and mine the same in a good and minerlike manner, and, among various other terms and conditions, the following:

"And. the party of the second part [H. J. Patterson] does hereby specially agree not to assign this lease or lay, or any interest therein or thereunder, and not to sublet or sublease the said demised premises, or any part thereof, nor to permit the same, nor any part thereof, nor any interest therein, to pass to any other person whatever, without the written consent of the party of the first part [Wickersham] had and obtained, and this prohibition shall extend to the undivided one-fourth interest belonging to the party of the second part as fully as to the interest belonging to the party of the first part."

The deed from Wickersham to H. J. Patterson of the one-quarter interest in the claim was made October 14, 1911, and contained this recitation:

"Said conveyance is made in consideration of the doing of the assessment work thereon by the vendee in the year 1910, in compliance with the United States statute."

That deed was recorded at the request of Patterson. The deed from the latter to his wife was made November 27, 1911, expressing a consideration of $1 and quitclaiming to her "all his right, title, and interest, being an undivided one-fourth interest," in the Daly Bench claim. That deed did not purport to convey to the defendant Mariam A. Patterson any part of her husband's interest in the amount then due or afterwards to become due to him from Hamilton under the lease by which the latter worked the ground, and certainly did not convey to her any part of

the 5 per cent. of the gross mineral output which was derived from the undivided three-fourths of the claim owned by Wickersham. It is therefore impossible to sustain the judgment of the court below, awarding to the defendant Mariam A. Patterson the whole of the 5 per cent. of the mineral output of the claim realized by Hamilton in the working of the claim under the lease assigned to him.

[2] Besides, while the defendant H. J. Patterson testified that his wife paid out of her separate property for the sinking of the two holes on the Daly Bench claim, in consideration of which he had told her that she should have the quarter interest agreed by Wickersham to be conveyed to him, the testimony of the witnesses Peoples and Junkin clearly tended to sustain the contention of the complainant in the suit that the conveyance of that quarter interest by Patterson to his wife was for the purpose of defrauding his then creditors. Junkin testified, among other things, that he was working for the said H. J. Patterson during the spring and summer of 1911 on a claim situated on Engineer creek, during which time Patterson told him of the striking of pay ground by Horner & Co. next to the Daly Bench claim, and that he and Patterson at the time talked of working the latter claim in consequence of that strike; the witness, in answer to questions, saying:

"He [Patterson] talked about it quite often. Afterwards, I think in the latter part of October, or early in November, one day Mr. Peoples was out there—(interrupted). Q. What was Mr. Peoples' purpose there, if you know? A. I had an idea, but I didn't know for a fact. But Mr. Patterson did tell me that Peoples was out there and was pressing him for money. Q. Was what? A. Was pressing him for money. Q. Yes? A. And he said, if they kept on pressing him, that he would put the Eva creek property in his wife's name, and would let Mr. Peoples and the rest of his creditors do whatever they liked about it. But he said that he would guarantee the men's wages out of the Eva creek property, provided he couldn't make the Last Chance Association (on Engineer creek) lay pay. Q. When you said 'Eva creek property,' what property was mentioned? A. The Daly Bench. Q. Did he use the terms interchangeably, the Eva creek property and the Daly Bench? A. Sometimes he called it the Daly Bench, and sometimes the Eva creek property. Q. What did you say then? A. I asked him why he hadn't it in his wife's name long ago, if he expected they were going to make trouble for him. He said, if he put in his wife's name, it would hurt his credit still further."

And the witness Peoples, after testifying that H. J. Patterson was indebted to him in the sum of about $4,000, further testified, among other things, as follows:

"On the 15th of November I received a check from Mr. Patterson for $1,000, and we were unable to get it cashed. Well, Mr. Patterson at that time told us from the following clean-up that he would take that up. This he failed to do, and I should judge about a week later I had a conversation with him concerning other property that he had. Q. Had you in the meantime seen any record, or heard anything about any deed being recorded, conveying to him an interest in the Daly Bench on Eva creek? A. Yes, sir. Q. Now, where did the conversation take place? A. In the office of the store.

"Mr. Heilig: When was this that you saw the record? A. It was just a day or so, I judge, after, or a few days after, the conveyance to Patterson.

"Mr. Clark: Q. From Judge Wickersham? A. Yes, sir; I believe it was from the judge. Q. Who called your attention to the fact that the conveyance had been made?

"The Court: What conveyance?

"Mr. Clark: From Judge Wickersham to Patterson of an interest in the Daly Bench. Q. Who called your attention to the fact that a conveyance had been made? A. I noticed it in the paper, and Mr. Stroecker also called my attention to it. Q. Mr. Stroecker was then and is now in your employ? A. Yes. Q. And Mr. Stroecker is now trustee in bankruptcy in this H. J. Patterson matter? A. Yes, sir. Q. And is the plaintiff in this action? A. Yes, sir. Q. That was before the bankruptcy proceedings were instituted? A. Yes, sir. Q. Just tell what you did after you ascertained that that transfer had been made from Judge Wickersham to Mr. Patterson. A. I asked Mr. Patterson if he would not give us security on his interest in this ground. Q. What ground? A. The ground on Ester creek. Q. Do you mean Ester creek, or Eva creek? A. Of Eva creek, tributary of Ester creek. Q. Is that the Daly Bench that you are referring to? A. Yes, sir; and he informed me at that time that through an arrangement with Mr. Wickersham that he couldn't give any security on that ground or transfer it in any manner. That was the sum and substance of the conversation. Q. What did he say about the ownership of that interest? A. There was nothing said regarding that. Q. What did you say to him? Remember, as near as you can, the words you used to him in asking for security. A. I suggested to him that he had a quarter interest in, that, and he should put it up as security. Q. Did he deny that he had a quarter interest? A. No, sir. Q. The reason he gave you for not putting it up was that he had a written agreement—(interrupted). A. With Judge Wickersham. Q. (continuing)—With Judge Wickersham whereby he couldn't incumber it? A. Yes, sir. Q. Did you talk with him anything about the possibility of that ground producing any money, or anything of that kind? A. I think not at that time. Q. Did you ever have any other conversation with him at any other time about that particular property? A. No, sir; that is, not that I remember of now. Q. Did you receive any information thereafter that he had conveyed that quarter interest to Mrs. Patterson? A. Yes, sir. Q. How long after that, if you remember? A. I should judge it would be two weeks after that. Q. Did you have any talk with him after you saw that he had conveyed it to Mrs. Patterson? A. No, sir. Q. Shortly after that, you instituted suit in this court against him, did you not? A. Yes, sir. Q. Then, thereafter, instituted an action to set aside the conveyance? A. Yes, sir. Q. And after this bankruptcy proceeding was instituted, that suit was practically abandoned, and a similar suit was instituted by the trustee in bankruptcy, the present plaintiff in this action? A. Yes, sir."

In view of the foregoing testimony, and of all of the circumstances of the case, we think it clear that the burden was thereby cast upon the defendants to show the good faith and honesty of the conveyance in question, and that the court below was therefore in error in dismissing the suit upon the conclusion of the complainants' evidence, for the law is well settled that entire fairness is required in dealings between husband and wife, so far as they affect the rights of creditors.

The judgment is reversed, and the cause remanded to the court below for a new trial.